Filed 5/4/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| SUNGHO PARK, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S229728 |
| v. | ) | |
| | ) | Ct.App. 2/4 B260047 |
| BOARD OF TRUSTEES OF THE | ) | |
| CALIFORNIA STATE UNIVERSITY, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BC546792 |
| _____ | ) | |

To combat lawsuits designed to chill the exercise of free speech and petition rights (typically known as strategic lawsuits against public participation, or SLAPPs), the Legislature has authorized a special motion to strike claims that are based on a defendant's engagement in such protected activity. (See Code Civ. Proc., § 425.16, subd. (a).)[1] We consider a question that has generated uncertainty in the Courts of Appeal: What nexus must a defendant show between a challenged claim and the defendant's protected activity for the claim to be struck?

As we explain, a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity

---

[1] All further unlabeled statutory references are to the Code of Civil Procedure.

*itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted. Because the Court of Appeal ruled to the contrary, holding a claim alleging a discriminatory decision is subject to a motion to strike so long as protected speech or petitioning activity contributed to that decision, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Sungho Park was a tenure-track assistant professor at California State University, Los Angeles. He is of Korean national origin. In 2013, Park applied for tenure but his application was denied. He filed a discrimination charge with the Department of Fair Employment and Housing and, after receiving a right-to-sue letter, filed suit under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) for national origin discrimination and failure to receive a discrimination-free workplace.

Defendant the Board of Trustees of the California State University (University) responded with a motion to strike. Anti-SLAPP motions are evaluated through a two-step process. Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged. (§ 425.16, subd. (b); see *id.*, subd. (e) [defining protected activity]; *Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66–67.) If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89; see generally *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.) The University argued Park's suit arose from its decision to deny him tenure and the numerous communications that led up to and followed that decision, these communications

2

were protected activities, and Park had not shown a sufficient probability of prevailing on the merits.

The trial court denied the motion. It agreed with Park that the complaint was based on the University's decision to deny tenure, rather than any communicative conduct in connection with that decision, and that the denial of tenure based on national origin was not protected activity, so the University had not carried its burden of showing Park's suit arose from protected activity within the meaning of section 425.16, subdivision (e). Accordingly, the trial court did not reach the second step of the anti-SLAPP inquiry.

A divided Court of Appeal reversed. The majority reasoned that although the gravamen of Park's complaint was the University's decision to deny him tenure, that decision necessarily rested on communications the University made in the course of arriving at that decision. Such communications were in connection with an official proceeding, the tenure decisionmaking process, and so were protected activity for purposes of the anti-SLAPP statute. The dissent argued, in contrast, that all government action inevitably involves some form of communication, and courts must distinguish between instances when a claim challenges only the action itself and instances when a claim challenges the process that led to the action. Because the claim here, in the dissent's estimation, involved only the decision to deny tenure and not any arguably protected communications that preceded it, the trial court's ruling should have been affirmed.

The Court of Appeal's division is symptomatic of ongoing uncertainty over how to determine when "[a] cause of action against a person aris[es] from" that person's protected activity. (§ 425.16, subd. (b).) We granted review.

3

I.    *The Requisite Nexus Between the Claims an Anti-SLAPP Motion Challenges and Protected Activity*

Anti-SLAPP motions may only target claims "arising from any act of [the defendant] in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b).)  In turn, the Legislature has defined such protected acts in furtherance of speech and petition rights to include a specified range of statements, writings, and conduct in connection with official proceedings and matters of public interest.  (*Id.*, subd. (e).)[2]  We consider here the relationship a defendant must show between a plaintiff's claim and the sorts of speech on public matters the Legislature intended to protect.

A claim arises from protected activity when that activity underlies or forms the basis for the claim.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78; *Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 66; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1114.)  Critically, "the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech."  (*City of Cotati*, at p. 78; accord, *Equilon Enterprises*, at p. 66.)  "[T]he mere fact that an action was filed after protected activity took place does not mean the action arose from that

[2]    As relevant here, section 425.16, subdivision (e) defines an act in furtherance of speech or petition rights to "include[]: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, . . . or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

activity for the purposes of the anti-SLAPP statute." (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89; see *City of Cotati*, at p. 78 [suit may be in "response to or in retaliation for" protected activity without necessarily arising from it].) Instead, the focus is on determining what "the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier*, at p. 92, italics omitted.) "The only means specified in section 425.16 by which a moving defendant can satisfy the ['arising from'] requirement is to demonstrate that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in subdivision (e) . . . ." (*Equilon Enterprises*, at p. 66, italics added.) In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability.

Thus, for example, in *City of Cotati v. Cashman*, *supra*, 29 Cal.4th 69, the plaintiff city filed a state suit seeking a declaratory judgment that its rent control ordinance was constitutional. The suit followed in time the defendant owners' federal suit seeking declaratory relief invalidating the same ordinance. In the state action, the defendants filed an anti-SLAPP motion alleging the suit arose from their protected activity of filing the federal suit. The motion, we explained, should have been denied because the federal suit formed no part of the basis for the state claim. The city's potential entitlement to a declaratory judgment instead arose from the parties' underlying dispute over whether the ordinance was constitutional, a dispute that existed prior to and independent of any declaratory relief action by the owners. (*Id.* at p. 80.)

In contrast, in *Navellier v. Sletten*, *supra*, 29 Cal.4th 82, another case in which the defendant's protected activity was the prior filing of court claims, the prior claims were an essential part of the activity allegedly giving rise to liability.

5

The *Navellier* plaintiffs sued for breach of contract and fraud, alleging the defendant had signed a release of claims without any intent to be bound by it and then violated the release by filing counterclaims in a pending action in contravention of the release's terms. Unlike in *City of Cotati*, the defendant was "being sued because of the affirmative counterclaims he filed in federal court. In fact, but for the federal lawsuit and [defendant's] alleged action taken in connection with that litigation, plaintiffs' present claims would have no basis. This action therefore falls squarely within the ambit of the anti-SLAPP statute's 'arising from' prong." (*Navellier*, at p. 90.)

While in both cases it could be said that the claim challenged as a SLAPP was filed *because of* protected activity, in that perhaps the *City of Cotati* plaintiff would not have filed suit had the defendant not done so first, in only *Navellier* did the prior protected activity supply elements of the challenged claim. The *City of Cotati* plaintiff could demonstrate the existence of a bona fide controversy between the parties supporting a claim for declaratory relief without the prior suit, although certainly the prior suit might supply evidence of the parties' disagreement. In contrast, specific elements of the *Navellier* plaintiffs' claims depended upon the defendant's protected activity. The defendant's filing of counterclaims constituted the alleged breach of contract. (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 87.) Likewise, the defendant's misrepresentation of his intent not to file counterclaims, a statement we explained was protected activity made in connection with a pending judicial matter (see § 425.16, subd. (e)(1), (2)), supplied an essential element of the fraud claim (*Navellier*, at pp. 89–90). Together, these cases reflect what we have described elsewhere, in a non-SLAPP context, as "a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon

6

an underlying course of conduct evidenced by the communication." (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 888.)

Many Courts of Appeal likewise are attuned to and have taken care to respect the distinction between activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim. In *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn.* (2004) 125 Cal.App.4th 343, a fire protection district sued a county retirement board over the pension contribution levels the board decided to impose. The board filed an anti-SLAPP motion, arguing the suit arose out of the deliberations and vote that produced its decision. The Court of Appeal disagreed. It explained that " '[t]he [anti-SLAPP] statute's definitional focus is . . . [whether] the defendant's activity *giving rise to his or her asserted liability . . .* constitutes protected speech or petitioning.' " (*Id.* at p. 354.) It distinguished between the board's allegedly wrongful act (the contribution level decision) and the preceding deliberations and vote. "[T]he fact that a complaint alleges that a public entity's action was taken as a result of a majority vote of its constituent members does not mean that the litigation challenging that action *arose from* protected activity, where the measure itself is not an exercise of free speech or petition. Acts of governance mandated by law, without more, are not exercises of free speech or petition." (*Ibid.*; see *City of Montebello v. Vasquez, supra*, 1 Cal.5th at pp. 425–426 [discussing with approval *San Ramon*'s distinction, for anti-SLAPP purposes, between government decisions and the deliberations that lead to them].)

*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207 illustrates the related distinction between speech that provides the basis for liability and speech that provides evidence of liability. There, a company sued a city after its government contract was terminated and a new

7

contract awarded without competitive bidding to a rival. The trial court granted the city's anti-SLAPP motion. Reversing, the Court of Appeal explained, "In deciding whether an action is a SLAPP, the trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications or prior litigation may provide evidentiary support for the complaint without being a basis of liability. An anti-SLAPP motion should be granted if liability is based on speech or petitioning activity itself." (*Id.* at pp. 1214–1215.) While communications by the city preceding its decision might be helpful in establishing what events led to the change in contract, the contractor's claims were not based on them, but on the award of a new contract in alleged violation of laws regulating competitive bidding. (*Id.* at pp. 1215, 1224.)

In *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, plaintiffs sued for malpractice after the defendants' representation of them in a prior lawsuit led to their answer and cross-complaint being struck as a terminating sanction for discovery violations. The attorney defendants filed an anti-SLAPP motion, arguing the malpractice suit arose out of a declaration they had submitted in the earlier suit admitting misconduct and seeking to set aside the terminating sanction under section 473. While the declaration supplying "*evidence* of [the attorneys']  conduct" (*Jespersen*, at p. 631) might be protected, this was insufficient to carry the attorney-defendants' first-step burden: they were being sued not for filing the declaration, but for the underlying misconduct (*id.* at p. 632; see *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1399 [emphasizing that courts should not confuse a party's "allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct" and denying an anti-SLAPP motion where the plaintiff sought no relief for the defendant's communicative acts].)

8

Courts presented with suits alleging discriminatory actions have taken similar care not to treat such claims as arising from protected activity simply because the discriminatory animus might have been evidenced by one or more communications by a defendant. In *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273, the Department of Fair Employment and Housing (DFEH) sued a landlord for failing to provide accommodations to a disabled tenant. The landlord had advised the rent control board it was removing units from the housing market, disputed the tenant's assertion of a disability that would have entitled her to one year to find alternate housing, and ultimately filed an unlawful detainer action against her and evicted her. The landlord responded to the disability suit with an anti-SLAPP motion, arguing the suit arose out of communications with the rent control board and tenant and the unlawful detainer suit. The Court of Appeal disagreed. The act giving rise to liability was the "fail[ure] to accommodate [the tenant's] disability" by allowing the tenant time to seek alternate housing; "[t]he letters, e-mail and filing of unlawful detainer actions constituted DFEH's *evidence* of [the landlord's] alleged disability discrimination." (*Id.* at pp. 1284–1285.)

In *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, the plaintiff sued his public agency employer for racial and age discrimination and retaliation, resulting in his constructive discharge, as well as defamation. The agency argued in an anti-SLAPP motion that the suit arose from negative evaluations of the plaintiff made by agency officers and board members. Addressing the nondefamation claims, the Court of Appeal rejected this argument; "the pleadings establish[ed] that the gravamen of plaintiff's action against defendants was one of racial and retaliatory discrimination, not an attack on [defendants] for their evaluations of plaintiff's performance as an employee." (*Id.* at p. 625.) Liability, if any, would arise from the constructive discharge of

9

plaintiff for illegal reasons, not the defendants' evaluations of plaintiff at the agency's board meeting. (*Id.* at pp. 624–625.)

Most recently, in *Nam v. Regents of University of California* (2016) 1 Cal.App.5th 1176, the plaintiff, a University of California Davis medical resident, sued for sexual harassment, discrimination, and wrongful termination. The defendant Regents' anti-SLAPP motion contended the suit arose from communicated complaints about the plaintiff's performance, written warnings it issued her, an investigation it conducted, and the written notice to plaintiff of her termination. Not so; the basis for liability was instead the Regents' alleged retaliatory conduct, including " 'subjecting [plaintiff] to increased and disparate scrutiny, soliciting complaints about her from others, removing [her] from the workplace, refusing to permit her to return, refusing to give her credit towards the completion of her residency, failing to honor promises made regarding her treatment, and ultimately terminating her on February 2, 2012.' " (*Id.* at p. 1192.) *Nam* illustrates that while discrimination may be carried out by means of speech, such as a written notice of termination, and an illicit animus may be evidenced by speech, neither circumstance transforms a discrimination suit to one arising from speech. What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration.

As many Courts of Appeal have correctly understood, to read the "arising from" requirement differently, as applying to speech leading to an action or evidencing an illicit motive, would, for a range of publicly beneficial claims, have significant impacts the Legislature likely never intended. Government decisions are frequently "arrived at after discussion and a vote at a public meeting." (*San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Association*, *supra*, 125 Cal.App.4th at p. 358.) Failing to distinguish

between the challenged decisions and the speech that leads to them or thereafter expresses them "would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power." (*Ibid.*; accord, *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, *supra*, 181 Cal.App.4th at pp. 1224–1225.) Similar problems would arise for attempts to enforce the state's antidiscrimination public policy. "Any employer who initiates an investigation of an employee, whether for lawful or unlawful motives, would be at liberty to claim that its conduct was protected and thereby shift the burden of proof to the employee who, without the benefit of discovery and with the threat of attorney fees looming, would be obligated to demonstrate the likelihood of prevailing on the merits." (*Nam v. Regents of University of California*, *supra*, 1 Cal.App.5th at p. 1189.) Conflating, in the anti-SLAPP analysis, discriminatory decisions and speech involved in reaching those decisions or evidencing discriminatory animus could render the anti-SLAPP statute "fatal for most harassment, discrimination and retaliation actions against public employers." (*Id.* at p. 1179.)

II.    *Application to This Record*

We review de novo the grant or denial of an anti-SLAPP motion. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity. (*Schwarzburd v. Kensington Police Protection & Community Services Dist. Bd.* (2014) 225 Cal.App.4th 1345, 1350; *Martin v. Inland Empire Utilities Agency*, *supra*, 198 Cal.App.4th at p. 624.) In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based. (§ 425.16, subd. (b)(2); *Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89.) We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any

11

contrary evidence from the defendant establishes its entitlement to prevail as a matter of law.  (*Soukup*, at p. 269, fn. 3.)

Park's discrimination claim requires that he show "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.)  Park has alleged that he is of Korean national origin, was qualified for tenure, and was denied tenure while other faculty of Caucasian origin with comparable or lesser records were granted tenure.  The complaint also alleges a school dean "made comments to Park and behaved in a manner that reflected prejudice against him on the basis of his national origin" and that Park pursued an internal grievance, which was denied.  The elements of Park's claim, however, depend not on the grievance proceeding, any statements, or any specific evaluations of him in the tenure process, but only on the denial of tenure itself and whether the motive for that action was impermissible.  The tenure decision may have been communicated orally or in writing, but that communication does not convert Park's suit to one arising from such speech.  The dean's alleged comments may supply evidence of animus, but that does not convert the statements themselves into the basis for liability.  As the trial court correctly observed, Park's complaint is "based on the act of denying plaintiff tenure based on national origin. Plaintiff could have omitted allegations regarding communicative acts or filing a grievance and still state the same claims."  (See *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC*, *supra*, 154 Cal.App.4th at p. 1285 ["DFEH might well have filed the same lawsuit had [the landlord] simply

12

ignored [the tenant's] claim of disability and requests for extension of her tenancy without any communication from it at all"].)**3**

The University offers a threefold response. First, it asserts that anti-SLAPP motions are decided on the pleadings *and* any evidence the parties submit, and so Park could not hide the existence of University communications by omitting them from his complaint. This misses the point of the trial court's observation, which is that the elements of Park's claims do not depend on proof of any University communications. No one disputes the University can submit evidence of communications leading to the decision to deny tenure, but doing so does not establish those communications, rather than the tenure denial decision itself, as the "facts upon which the liability . . . is based." (§ 425.16, subd. (b)(2).) Communications disparaging Park, without any adverse employment action, would not support a claim for employment discrimination, but an adverse employment action, even without the prior communications, surely could.

Second, the University urges that its tenure decision and the communications that led up to it are intertwined and inseparable. It bases this argument on *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192 and *Kibler*'s progeny, which it contends establish that decisions and the deliberations that underlie them are indistinguishable for anti-SLAPP purposes.

_____

**3**     Park's first claim is a traditional claim for discrimination based on national origin. His second claim asserts in its entirety, "By virtue of the foregoing, [the University] has failed to provide Park with a workplace environment free of discrimination." Because neither party argues the claim for a discriminatory workplace environment should be analyzed any differently for anti-SLAPP purposes from the claim for discrimination in employment, we do not differentiate between them.

13

*Kibler* lends no support. There, the plaintiff doctor sued a hospital and various individual defendants for defamation and related torts. The trial court in *Kibler* found, and we accepted for purposes of review, that these tort claims arose from statements made in connection with a hospital peer review proceeding. The only issue before us was whether, assuming this to be so, the peer review proceeding was an " 'official proceeding' " within the meaning of the anti-SLAPP statute. (*Kibler v. Northern Inyo County Local Hospital Dist.*, *supra*, 39 Cal.4th at p. 198; see § 425.16, subd. (e)(2) [defining protected activity to include "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other *official proceeding* authorized by law" (italics added)].) That is, we took for granted lower court findings as to what activity the tort claims arose from under section 425.16, subdivision (b)(1), and then considered whether that activity constituted protected activity under a particular portion of subdivision (e)'s statutory definition. We did not consider whether the hospital's peer review decision and statements leading up to that decision were inseparable for purposes of the arising from aspect of an anti-SLAPP motion, because we did not address the arising from issue. (See *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 58 [correctly recognizing *Kibler* addressed only whether hospital peer review proceedings can be " 'official proceedings,' " and courts resolving anti-SLAPP motions must still separately determine whether a given claim arises from any protected activity].)

Applying our decision in *Kibler*, the Court of Appeal in *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65 concluded an anti-SLAPP motion against the claims of a doctor who alleged discriminatory and retaliatory termination of privileges was properly granted. The *Nesson* court reasoned that under *Kibler*, a hospital's peer review proceedings are official

14

proceedings, and thus every aspect of those proceedings, including the decision to impose discipline, is protected activity for anti-SLAPP purposes. (*Nesson*, at pp. 78–79, 82–84.) Similarly, in *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, the Court of Appeal concluded *Kibler* dictated finding the allegedly discriminatory decision not to renew a doctor's contract to be protected activity. The court correctly considered the elements of the plaintiff's claims in order to identify what conduct underlay each cause of action. (E.g., *DeCambre*, at p. 22.) However, it also concluded, in reliance on *Kibler*, that every part of the peer review process was protected activity. To the extent plaintiff's claims included as an essential element her termination, and that termination was a product of peer review, her claims arose from protected activity. (*DeCambre*, at pp. 14–16.)

The University argues by analogy that all aspects of its tenure process, including its ultimate decision, are inextricably intertwined protected activity, and the Court of Appeal here agreed. But both *Nesson* and *DeCambre* overread *Kibler*, which did not address whether every aspect of a hospital peer review proceeding involves protected activity, but only whether statements in connection with but outside the course of such a proceeding can qualify as "statement[s] . . . in connection with an issue under consideration" in an "official proceeding." (§ 425.16, subd. (e)(2).) *Kibler* does not stand for the proposition that disciplinary decisions reached in a peer review process, as opposed to statements in connection with that process, are protected. We disapprove *Nesson v. Northern Inyo County Local Hospital Dist.*, *supra*, 204 Cal.App.4th 65, and *DeCambre v. Rady Children's Hospital-San Diego*, *supra*, 235 Cal.App.4th 1, to the extent they indicate otherwise.

In support of the argument for inseparability, the University also cites *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387. In *Vergos*, the plaintiff

complained of sexual harassment and filed an internal grievance, which was denied. Plaintiff then sued both his public university employer and the individual employee who had served as a hearing officer and denied his grievance. The civil rights claim against the individual hearing officer expressly rested on her " 'hearing, processing, and deciding the grievances' " (*id.* at p. 1391) as well as the allegation the employer and officer had deprived him of a hearing before a " 'fair and impartial hearing officer' " (*id.* at p. 1392). The Court of Appeal concluded this claim arose from the officer's "statements and communicative conduct in handling plaintiff's grievance." (*Id.* at p. 1394.) In turn, the hearing officer's conduct of an internal grievance proceeding was protected activity because it furthered employees' rights to petition for redress of harassment, discrimination, and similar complaints. (*Id.* at pp. 1398–1399.)

*Vergos* does not assist the University. In *Vergos*, only the individual officer filed an anti-SLAPP motion, and the court was not called on to decide whether any of the claims against the employer defendant arose from protected activity. *Vergos* does not stand for the proposition that a suit alleging an entity has made a discriminatory decision necessarily also arises from any statements by individuals that may precede that decision, or from the subsequent communication of the decision that may follow. As the *Vergos* court observed, denying protection to the hearing officer's participation in the process might chill employees' willingness to serve and hamper the ability to afford harassed employees review of their complaints. (*Vergos v. McNeal*, *supra*, 146 Cal.App.4th at pp. 1398–1399.) Likewise, to deny protection to individuals weighing in on a public entity's decision might chill participation from a range of voices desirous of offering input on a matter of public importance. But no similar concerns attach to denying protection for the ultimate decision itself, and none of the core purposes the Legislature sought to promote when enacting the anti-SLAPP statute are furthered

16

by ignoring the distinction between a government entity's decisions and the individual speech or petitioning that may contribute to them.[4]

The Court of Appeal found support from one other case, *Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, for the conclusion that a claim arising from a decision inevitably arises from the communications leading to that decision. The *Tuszynska* court concluded that, for anti-SLAPP purposes, a discrimination suit alleging an attorney was denied case referrals because she was a woman was necessarily based on both the referral decisions "and, concomitantly, communications defendants made in connection with making those decisions." (*Tuszynska*, at p. 269.) To the extent *Tuszynska v. Cunningham*, *supra*, 199 Cal.App.4th 257 presupposes courts deciding anti-SLAPP motions cannot separate an entity's decisions from the communications that give rise to them, or that they give rise to, we disapprove it.

Third, the University contends that even if the tenure decision alone is treated as the basis for this case, that decision is protected activity. The University places principal reliance on *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510. There, the plaintiff sued over the defendant's allegedly discriminatory refusal to hire him as a weather news anchor. The reporting of news, whether in print or on air, is constitutionally protected free speech (*Briscoe*

---

**4**      We have described the anti-SLAPP statute as "intended broadly to protect, inter alia, direct petitioning of the government and petition-related statements and writings." (*Briggs v. Eden Council for Hope & Opportunity*, *supra*, 19 Cal.4th at p. 1120; see Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (1991–1992 Reg. Sess.) as introduced Jan. 6, 1992, pp. 3–4 [highlighting the need to address unmeritorious tort suits filed against private citizens and associations for exercising their rights to seek changes in government policy].) These concerns are promoted, not impaired, by differentiating between individual speech that contributes to a public entity's decision and the public entity decision itself.

17

*v. Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 534–536), and *Hunter* treats a news media organization's decision as to who shall report the news as an act in furtherance of that protected speech (*Hunter*, at p. 1521).

The University argues that tenure decisions implicate the public interest as much as decisions concerning who should appear in a news broadcast and thus are equally entitled to protection. But this argument fails to appreciate the underlying structure of the position accepted in *Hunter* and thus offers a mismatched analogy. The defendant television station argued that (1) the station itself engaged in speech on matters of public interest through the broadcast of news and weather reports, and (2) the decision as to who should present that message was thus conduct in furtherance of the station's protected speech on matters of public interest, to wit, its news broadcasts. (See § 425.16, subd. (e)(4) [defining as protected activity "any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest"]; *Hunter v. CBS Broadcasting Inc.*, *supra*, 221 Cal.App.4th at pp. 1518–1521.) Whether the hiring decision itself was a matter of any particular public importance was immaterial. (See *Hunter,* at p. 1527 ["the proper inquiry is not whether CBS's selection of a weather anchor was itself a matter of public interest; the question is whether such conduct was 'in connection with' a matter of public interest. As Hunter concedes, weather reporting is [speech in connection with] a matter of public interest."]; *id.* at p. 1527, fn. 3 [declining to consider the significance of the hiring decision itself].)

To make a similar argument, the University would have had to explain how the choice of faculty involved conduct in furtherance of *University speech* on an identifiable matter of public interest. But the University has not developed or preserved any such argument before us. It has not explained what University expression on matters of public interest the retention or nonretention of this faculty

18

member might further, nor has it discussed the circumstances in which a court ought to attribute the speech of an individual faculty member to the institution with which he or she is affiliated. Whether the grant or denial of tenure to this faculty member is, or is not, itself a matter of public interest has no bearing on the relevant questions—whether the tenure decision furthers particular University speech, and whether that speech is on a matter of public interest—and cannot alone establish the tenure decision is protected activity under section 425.16, subdivision (e)(4).

We have no occasion to consider the scope of free speech protection for professors, the potential liberties at stake in a university's choice of faculty (cf. *University of Pennsylvania v. E.E.O.C.* (1990) 493 U.S. 182, 195–198 & fn. 6; *Sweezy v. New Hampshire* (1957) 354 U.S. 234, 262–263 (conc. opn. of Frankfurter, J.)), or under what circumstances the protected speech of an individual professor might be attributable to a private or public university for either free speech or anti-SLAPP purposes. Nor do we express any opinion concerning whether *Hunter v. CBS Broadcasting Inc.*, *supra*, 221 Cal.App.4th 1510, itself was correctly decided. We hold simply that the assertion the University's hiring decision is a matter of public interest does not suffice to bring that decision within the scope of protected activity defined by section 425.16, subdivision (e)(4).

Accordingly, the University has not carried its burden of showing "the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e)." (*Equilon Enterprises v. Consumer Cause, Inc.*, *supra*, 29 Cal.4th at p. 66; see *City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.)

## CONCLUSION

We reverse the judgment of the Court of Appeal and remand for further proceedings not inconsistent with this opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Park v. Board of Trustees of California State University
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 239 Cal.App.4th 1258
**Rehearing Granted**

_____

**Opinion No.** S229728
**Date Filed:** May 4, 2017
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Richard E. Rico

_____

**Counsel:**

Towle, Denison, Smith & Maniscalco, Towle Denison & Maniscalco and Michael C. Denison for Defendant and Appellant.

Joseph T. Francke and Steven J. André for Californians Aware, First Amendment Project, Penelope Canan, Libertarian Law Council, Angie Morfin Vargas, City Watch, Inc., and Consumer Attorneys of California as Amici Curiae on behalf of Defendant and Appellant.

Siegel & Yee, Jane E. Brunner and Alan S. Yee for Plaintiff and Respondent.

Davis Wright Tremaine, Thomas R. Burke, Nicolas A. Jampol and Diana Palacios for First Amendment Coalition as Amicus Curiae on behalf of Plaintiff and Respondent.

Briggs Law Corporation, Anthony N. Kim and Cory J. Briggs for San Diegans for Open Government and The Inland Oversight Committee as Amici Curiae on behalf of Plaintiff and Respondent.

Duchrow & Piano and David J. Duchrow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael C. Denison
Towle Denison & Maniscalco
11111 Santa Monica Boulevard, Suite 330
Los Angeles, CA  90025
(310) 446-5445

Alan S. Yee
Siegel & Yee
499 14th Street, Suite 300
Oakland, CA  94612
(510) 839-1200